1
2
3
4
5
6

**SAN DIEGO UNIFIED PORT DISTRICT**
**DUANE E. BENNETT, ESQ. (SBN 110202)**
**PORT ATTORNEY**
**ELLEN GROSS MILES, ESQ. (SBN 149127)**
**DEPUTY PORT ATTORNEY**
**3165 Pacific Highway**
**P.O. Box 120488**
**San Diego, CA 92112-0488**
**Phone:      (619) 686-6219**
**Fax:         (619) 686-6444**

7

Attorneys for Defendant, SAN DIEGO UNIFIED PORT DISTRICT

8

**UNITED STATES DISTRCIT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

11
12
13
14
15
16
17
18
19

| | |
|---|---|
| DANIEL RENARD | Case No. 07-CV-2347-H (BLM) |
|            Plaintiff, | |
| v. | |
| SAN DIEGO UNIFIED PORT DISTRICT and DOES 1 through 65, INCLUSIVE | **DEFENDANT SAN DIEGO UNIFIED PORT DISTRICT'S OPPOSITION TO PLAINTIFF'S MOTION FOR REMAND** |
|            Defendants, | Judge: HON. MARILYN R. HUFF |

20

    Defendant, SAN DIEGO UNIFIED PORT DISTRICT ("District") hereby submits this

21

opposition to plaintiff's Opposition to Removal and Motion for Remand.

22

**I.**

23
24

**THE DISTRICT PROPERLY BROUGHT ITS ACTION WITHIN THE 30 DAY STATUTORY LIMIT SET FORTH UNDER 28 U.S.C. § 1446**

25

    Plaintiff filed a First Amended Verified Complaint ("FAVC") on November 19, 2007 in

26

the San Diego Superior Court, which alleged a federal question.  A copy of the FAVC is

27

attached hereto as Exhibit "B" and incorporated by this reference.  The District removed the

28

1  matter to this Court on December 17, 2007.  This time period is 28 days, well within the

2  statutory defined period of 30 days.

3                                             II.

4

5  ### THE FEDERAL COURT PROPERLY RETAINS JURISDICTION OVER A FEDERAL QUESTION UNDER 28 U.S.C. § 1441(b)

6  Federal law may create the plaintiff's cause of action by an express statutory

7  provision, *see, e.g.,* 42 U.S.C. § 1983 (civil rights actions) or the Supreme Court may find an

8  implied cause of action under the Constitution or a statute, *see, e.g.,* Bivens v. Six Unknown

9  Fed. Narcotics Agents, 403 U.S. 388, 395-397 (1971); Lampf, Pleva, Lipkind, Prupis &

10  Petigrow v. Gilbertson, 502 U.S. 350 (1991).

11  Plaintiff's FAVC alleges claims which are clearly grounded in 42 U.S.C. §1983 and

12  therefore properly subject to removal to this Court.

13  At pg. 3, ¶ 12 of the FAVC, plaintiff alleges as follows:  "Plaintiff is informed and

14  believes, and upon such information and belief alleges that the SAN DIEGO UNIFIED PORT

15  DISTRICT has a pattern,  practice and policy of seizing vessels."  This is the first time such

16  an allegation has appeared in the pleadings.

17  Because the District is the only named defendant in this action, its alleged "pattern,

18  practice and policy of seizing vessels" describes a classic allegation of municipal liability

19  based upon the seminal case of Monell v. New York Department of Social Services, (1978)

20  436 U.S. 658, and its progeny.  Plaintiff's inclusion of allegations pertaining to federal

21  regulations such as 33 C.F.R. § 110, 90 leave no doubt that the subsequent illegal seizures

22  were done in violation of the federal regulations establishing a Fourth Amendment violation

23  (the seizure) over which this Court has jurisdiction.

24  In Smith v. Dearborn Financial Services, Inc., (6th Cir. 1993) 982 F.2d 976, 978, the

25  District Court dismissed the federal issues in plaintiff's complaint because there was no

26  **express private right of action** under the regulations promulgated pursuant to the Federal

27  Credit Union Act.  The court found that "federal regulations cannot **themselves** create a

28  cause of action; that is a function of legislature" (Id. at 979)  (emphasis added.)

2

1          Unlike the <u>Smith</u> case cited by plaintiff, the FAVC clearly alleges an express private

2  right of action pursuant to 42 U.S.C. § 1983, the Fourth Amendment, and <u>Monell</u>, <u>supra</u>.   In

3  the case at bar, plaintiff alleges that the District's actions are in violation of federal

4  government regulations under the United States Coast Guard, 33 CFR 110.90. (FAVC p. 3, ¶

5  13.)   In fact, these regulations have been legislated with Congressional intent under a larger

6  statutory scheme, e.g.,   33 U.S.C. §§2030(g) and 2035(j) et seq., which pertain to federal

7  anchoring regulations.  Moreover, plaintiff is alleging an unconstitutional seizure of vessels by

8  the District pursuant to a pattern, practice or policy which results in the violation of plaintiff's

9  Fourth Amendment rights, which is an express private right of action plaintiff holds against

10  the District.

11                            **III.**

12                     **CONCLUSION**

13          As stated, plaintiff has failed to state facts sufficient to oppose removal.   Therefore,

14  the District respectfully requests that this Court deny plaintiff's motion to remand.

15

16  Dated:  January 28, 2008             SAN DIEGO UNIFIED PORT DISTRICT
                                       DUANE E. BENNETT

17                                   PORT ATTORNEY

18

19

20                       By:   s/Ellen Gross Miles
                               ELLEN GROSS MILES

21                             Deputy Port Attorney
                             Attorney for Defendant

22                             SAN DIEGO UNIFIED PORT DISTRICT
                             E-Mail egross@portofsandiego.org

23

24

25

26

27

28

<u>DANIEL RENARD  v. SAN DIEGO UNIFIED PORT DISTRICT, et al.</u>
Case No. 07-CV-2347-H (BLM)

## INDEX TO EXHIBITS

| EXHIBIT | PAGE(S) | DOCUMENT |
|---------|---------|----------|
| A | 1 – 22 | FIRST AMENDED VERIFIED COMPLAINT FILED NOVEMBER 19, 2007. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

EXHIBIT A

1  DANIEL RENARD
   P.O. Box 6301
2  San Diego, California 92166
   Phone: 619-675-1692
3
4  Plaintiff, In Pro Se
5
6
7
8              **THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**
9                   **IN AND FOR THE COUNTY OF SAN DIEGO**
10                          **HALL OF JUSTICE**

11  DANIEL RENARD

12          Plaintiff,

13  vs.

14  SAN DIEGO UNIFIED PORT DISTRICT
    and, DOES 1 through 65, INCLUSIVE
15
            Defendants,
16
17
18
|  |  |
|---|---|
| | Case No. 37-2007-00073093-CU-BC-CTL |
| | FIRST AMENDED VERIFIED COMPLAINT: |
| | 1. Enforcement of Settlement Agreement;<br>2. Breach of Written Contract;<br>3. Negligent Misrepresentation;<br>4. Fraud & Deceit;<br>5. Breach of Implied Covenant of Good Faith and Fair Dealing;<br>6. Declaratory Relief |

19      COMES NOW, Plaintiff, DANIEL RENARD, and alleges against Defendants, SAN DIEGO

20  UNIFIED PORT DISTRICT, and, DOES 1though 65 INCLUSIVE, as follows:

21      1.  Plaintiff, DANIEL RENARD, is a disabled individual, and is, and at all times herein

22  mentioned was, a resident of the County of San Diego, State of California, within the jurisdictional

23  boundaries of this Court.

24      2.  Defendants, SAN DIEGO UNIFIED PORT DISTRICT, is a public entity created as a

25  public corporation by the California State Legislature to manage San Diego Harbor, and administer

26  the public lands along San Diego Bay, within the jurisdictional boundaries of this Court.

27      3.  Plaintiff is ignorant of the true names and capacities of the Defendant's sued herein as

28  DOES, 1 through 65 , INCLUSIVE, and therefore sues these Defendant's by such fictitious names.

                                                            00001

1    Plaintiff will amend this Complaint to show their true names and capacities when they have

2  been ascertained. Plaintiff is informed and believes, and upon such information and belief alleges

3  that each of the fictitiously named defendant's is responsible in some manner for the occurrences

4  herein alleged, and Plaintiff's damages were proximately caused by such Defendant's.

5    4. Plaintiff is informed and believes, and on that basis alleges that each of the fictitiously

6  named Defendant's were and are the agents, employees, or representatives of the other Defendant's

7  and acting in concert with the other.

8                              **SUMMARY OF ALLEGATIONS**

9    5. Plaintiff is the owner /operator of vessels in San Diego Bay, and is disabled.

10    6. On or about December 02, 2003, Plaintiff and Defendants, SAN DIEGO UNIFIED PORT

11  DISTRICT, entered into a settlement agreement and release of claims, (hereinafter referred to as the

12  "AGREEMENT" arising from a civil action filed by Plaintiff against Defendants in the United

13  States District Court case No. 03 CV 1443 J (JFS), on August 23, 2003.

14    7. Contained in the Agreement were provisions granting Plaintiff a "disabled", (persons

15  with disabilities), permit to anchor his vessel in the "A-9""disabled" free anchorage area.

16    8. On or about June 06, 2006, the Board of Port Commissioners of the SAN DIEGO

17  UNIFIED PORT DISTRICT, voted to permanently eliminate the "A-9" anchorage, and revoke

18  Plaintiffs disabled permit, in clear violation of their Agreement with Plaintiff. (a true copy of the

19  Settlement Agreement and Release of Claims is attached hereto as "Exhibit A", and made a part of

20  this pleading.)

21    10. Notwithstanding the breach of covenants contained in the Agreement, the elimination

22  of the "A-9" anchorage is in direct violation with the Port Districts own "Port Master Plan", which

23  has been confirmed by the California State Coastal Commission. (See letter from Diana Lily, Coast

24  Planner for the California Coastal Commission dated: June 21, 2007 and attached hereto as "Exhibit

25  B", and made a part of this pleading.)

26    11. Moreover, Defendant's, and each of them, through the elimination of said anchorages

27  have been unlawfully seizing and impounding vessels in the absolute absence of procedural and/or,

28  substantive due process to the vessel owners, including but not limited to Plaintiffs own vessel.

- 2 -

00002

12. Plaintiff is informed and believes, and upon such information and belief alleges that the SAN DIEGO UNIFIED PORT DISTRICT has a pattern practice and policy of seizing vessels

13. Plaintiff further alleges that such seizures are unlawful and in violation of current regulatory policies conveyed by the federal government to the United States Coast Guard pursuant to 33 CFR 110.90.

14. Additionally, pursuant to the Port Master Plan, such ordinances enacted by the Board of Port Commissioners are not, and do not take effect until publication in the Federal Register. Plaintiff is informed and believes, and upon such information and belief alleges that as of the date of production Defendants and each of them, have failed to publish their ordinances in the Federal Register. (See page 44 of the Port Master Plan, attached hereto as "Exhibit C", and made a part of this pleading.)

15. Defendant's practices as alleged herein are, and were, unfair, illegal, immoral, unethical and in violation of the law.

16. -//

## FIRST CAUSE OF ACTION

### (Enforcement of Settlement Agreement)

17. Plaintiff realleges and incorporates by reference all of the Paragraphs as fully set forth above.

18. Plaintiff alleges that on or about June 06, 2006, Defendants, and each of them, violated their "Agreement" with Plaintiff by and through the total elimination of the "A-9" anchorage and revocation of Plaintiffs disabled permit which is expressly addressed, (page 1, ¶ 1), of the Agreement.

19. Plaintiff further alleges that as a proximate result of the Defendants', and each of their, breach of Settlement Agreement, Plaintiff has been damaged in that he has had to incur legal fees and cost for enforcement, and for related costs, and mitigation expenses, in an amount which is presently unknown.

WHEREFORE, Plaintiff prays judgment against Defendants', and each of them, as hereinafter set forth.                                                                     00003

1

**FIRST CAUSE OF ACTION**

2

**(Enforcement of Settlement Agreement)**

3    12.  Plaintiff realleges and incorporates by reference all of the Paragraphs as fully set forth
4    above.

5    13.  Plaintiff alleges that on or about June 06, 2006, Defendants, and each of them, violated
6    their "Agreement" with Plaintiff by and through the total elimination of the "A-9" anchorage and
7    revocation of Plaintiffs disabled permit which is expressly addressed, (page 1, ¶ 1), of the
8    Agreement.

9    14.  Plaintiff further alleges that as a proximate result of the Defendants', and each of their,
10   breach of Settlement Agreement, Plaintiff has been damaged in that he has had to incur legal fees
11   and cost for enforcement, and for related costs, and mitigation expenses, in an amount which is
12   presently unknown.

13   WHEREFORE, Plaintiff prays judgment against Defendants', and each of them, as
14   hereinafter set forth.

15

**SECOND CAUSE OF ACTION**

16

_____**(Breach of Written Contract)**

17   15. Plaintiff realleges and incorporates by reference all of the Paragraphs as fully set forth
18   above.

19   16.  On or about December 02, 2003, Plaintiff entered into a written agreement with
20   Defendants, and each of them, which set terms performed in full or in part by the parties until
21   Defendants material breach on June 06, 2006 as described above.

22   17. Under the terms of the contract, Plaintiff was to have been issued a disabled permit
23   and allowed long term free anchoring in the "A-9" anchorage. Additionally, Plaintiff was to have
24   complied with all requirements of the "A-9" anchorage, (Please see "Exhibit A" attached hereto and
25   made a part of this pleading).

26   18. Pursuant to the written contract, Plaintiff at all times described herein satisfied his duties
27   performed all conditions, covenants, and promises under the written Agreement on his part to be
28   performed.

-8-
4

1    19. As a direct result of Defendants, and each of their, breach of the written Agreement,

2  Plaintiff has been damaged in that he has had to incur legal fees and cost, and for related costs, and

3  mitigation expenses, in an amount which is presently unknown.

4    WHEREFORE, Plaintiff prays judgment against Defendants', and each of them, as

5  hereinafter set forth.

6                                      **THIRD CAUSE OF ACTION**

7                                      **(Negligent Misrepresentation)**

8    20. Plaintiff realleges and incorporates by reference all of the Paragraphs as fully set forth

9  above.

10    21. On or about December 2, 2003, Plaintiff, Daniel Renard and Defendants, San Diego

11  Unified Port District, through their attorney of record, Ellen Gross Miles, entered into a settlement

12  agreement and release of claims regarding a previous  action filed by Plaintiff against Defendants

13  in the United States District Court, Case No. 03 CV 1443 J (JFS).

14    22. Pursuant to the above mentioned settlement agreement, Plaintiff agreed to dismiss its

15  action against Defendants in consideration for an anchoring permit in the A-9 anchorage in San

16  Diego Bay, allowing Plaintiff free long term anchoring in said anchorage.

17    23. Plaintiff alleges that Ellen Gross Miles, Attorney for Defendants, and the Board of Port

18  Commissioners, negligently misrepresented that the A-9 anchorage was to remain in existence and

19  permit able when she was completely aware that the Board of Port Commissioners for Defendant,

20  San Diego Unified Port District were planning on amending the existing law which would effectively

21  eliminate the "A-9" anchorage and which would render Defendants' agreement with Plaintiff useless

22  and without effect.

23    24. Defendants' attorney of record, Ellen Gross Miles, negligently misrepresented, and

24  caused Plaintiff to believe that the "A-9" anchorage was to going to continue to remain in existence

25  at the time she entered into contract with Plaintiff on behalf of Defendants, and that by and through

26  such existence Defendants would fulfill its obligation under the contract. But for their negligence,

27  Ellen Gross Miles, and the Board of Port Commissioners for Defendants, induced Plaintiff into

28  entering into said contract.

1    25. Plaintiff relied upon the representations of Ellen Gross Miles, in connection with the

2   negotiation of Plaintiffs Agreement with Defendants, and each of them, regarding Plaintiffs right to

3   long term free anchoring in the "A-9" anchorage and thereon dismissed its prior complaint against

4   Defendants, with prejudice.

5    26.  Plaintiff requests all damages reasonably incurred which exceed the maximum

6   jurisdiction of this Court incurred from all covenants and conditions contained in its contract with

7   Defendants, and each of them, made by Defendants to Plaintiff to his detriment.

8    WHEREFORE, Plaintiff prays judgment against Defendants', and each of them, as

9   hereinafter set forth.

10                          **FOURTH CAUSE OF ACTION**

11   _____(Fraud & Deceit)

12    27. Plaintiff realleges and incorporates by reference all of the Paragraphs as fully set forth

13   above.

14    25. On December 02, 2003, in San Diego California , the Board of Port Commissioners for

15   Defendants, San Diego Unified Port District, by and through their attorney, Ellen Gross Miles,

16   entered into a Settlement Agreement and Release of Claims, in which Defendants, and each of them,

17   agreed to issue a disabled permit to Plaintiff and grant Plaintiff the right to long-term free anchoring

18   in the "A-9" anchorage of San Diego Bay.

19    26.  Plaintiff materially relied on the representations of Defendants attorney, Ellen Gross

20   Miles, and its Board of Port Commissioners, that the A-9 anchorage was going to continue to remain

21   in existence, and that Plaintiff would be granted the right to long term free anchoring as agreed.

22   Upon such representations, Plaintiff dismissed its lawsuit against Defendants "with prejudice" .

23    27. Plaintiff is informed and believes, and upon such information and belief alleges that, the

24   true facts were that Ellen Gross Miles, and the Board of Port Commissioners, were fully aware at

25   the time they entered into Agreement with Plaintiff, that they were planning to eliminate the

26   anchorage which they agreed to issue a permit for, rendering their contract with Plaintiff useless.

27   /./.

28   /./.

00006

1         28. Plaintiff further alleges that the entire agreement and the intentional concealment of

2 facts, made by Ellen Gross Miles, and the Board of Port Commissioners, was done with the intent

3 of inducing Plaintiff dismiss its prior complaint with Defendant, with prejudice, and manipulate

4 Plaintiff into agreeing to a worthless contract.

5         29. At the time the agreement was made and at the time Plaintiff took the actions herein

6 described, Plaintiff was ignorant of Defendants', secret intention to eliminate the A-9 Anchorage.

7 Plaintiff could not, in the exercise of reasonable diligence, have discovered Defendants' secret

8 intentions based upon the promises and representations made by Ellen Gross Miles and the Board

9 of Port Commissioners. If Plaintiff had known of the actual intentions of Defendants, Plaintiff would

10 not have taken such action.

11         30. The aforementioned conduct of Ellen Gross Miles and the Board of Port Commissioners,

12 to wit, making entirely false representations regarding their intention of maintaining the "A-9"

13 anchorage, attempting to conceal their lies, all of which directly resulted in Plaintiff's damages

14 constitutes an intentional misrepresentation, deceit, an/or, concealment of material facts known to

15 Defendants', and each of them, with the intention of depriving Plaintiff of property or legal rights

16 or otherwise causing injury and was despicable conduct that subjected Plaintiff to a cruel and unjust

17 hardship in conscious disregard of Plaintiff's rights, so as to justify an award of exemplary and

18 punitive damages.

19         WHEREFORE, Plaintiff prays judgment against Defendants', and each of them, as

20 hereinafter set forth.

21                             **FIFTH CAUSE OF ACTION**

22               **(Breach of Covenant of Good Faith and Fair Dealing)**

23         31. Plaintiff realleges and incorporates by reference all of the Paragraphs as fully set forth

24 above.

25         32. As set forth above, Plaintiff did dismiss its prior lawsuit against Defendants, "with

26 prejudice, and only did so based upon the representations of Defendants, and each of them, that he

27 would be issued a disabled permit and thereon allowed long-term free anchoring and safe harbor, in

28 the "A-9" anchorage in San Diego Bay.

1  33. Notwithstanding, on June 06, 2006, the Board of Port Commissioners of the SAN

2  DIEGO UNIFIED PORT DISTRICT, elected to permanently eliminate the "A-9", anchorage and

3  revoke Plaintiffs' permit allowing him the right to long-term free anchoring in said anchorage.

4  34. Through such actions, Defendants, and each of them, have constructively failed to

5  cooperate with Plaintiff in the performance of all contacts, and thereby breached the implied

6  covenant of good faith and fair dealing, respectively.

7  35. Defendants, and each of them, failed to use their best effort to fulfill their obligations to

8  Plaintiff and/or to give Plaintiff any reasonable alternative to fulfill their contractual obligation.

9  36. As a direct proximate and consequential result of Defendants acts, Plaintiff has been

10  damaged in loss of his home, future profits, interest, cost, legal fees and cost, and for related costs,

11  and mitigation expenses, in an amount which is presently unknown.

12  WHEREFORE, Plaintiff prays judgment against Defendants', and each of them, as

13  hereinafter set forth.

14  **SIXTH CAUSE OF ACTION**

15  **(Declaratory Relief)**

16  37. Plaintiff realleges and incorporates by reference all of the Paragraphs as fully set forth

17  above.

18  38. An actual controversy has arisen and now exists between Plaintiff and Defendants, and

19  each of them in that Plaintiff contends and Defendants deny the following:

20  a)  Plaintiff contends that the Settlement Agreement is valid and enforceable;

21  b)  Defendant contends that the Settlement Agreement in invalid and non enforceable;

22  c)  Plaintiff desires a judicial determination of the respective rights and duties of

23  Plaintiff, on one hand and Defendants, on the other hand, with respect to the rights of the parties

24  under the Agreement, and in particular, the validity or invalidity of the Agreement. Such Declaration

25  is necessary and appropriate in order that Plaintiff may ascertain his rights and duties with respect

26  to the Agreement and his option rights, if any, under its Agreement with San Diego Unified Port

27  District.

28  /././

00008

1       39. Plaintiff desires a judicial determination of the respective rights and duties of

2  Plaintiff, on one hand and Defendants, on the other hand, with respect to 33 CFR 110. (a true copy

3  of the excerpt of the Federal Register is attached hereto as "Exhibit D", and made a part of this

4  pleading.

5      WHEREFORE, Plaintiff prays judgment against Defendants, and each of them, as follows:

6     a)    For special and general damages according to proof at the time of trial;

7     b)    For exemplary and punitive damages in an amount deemed sufficient to punish
            Defendants;

8

9     c)    For a Judicial Determination of the rights and duties of each party herein pursuant
            to settlement agreement;

10    d)    For attorneys fees and cost of suit incurred herein; and,

11    e)    For any and all such further relief as the Court may deem just and proper.

12

13  Dated: 11 - 19 - 07          By: _____
                                DANIEL RENARD

14                                 Plaintiff / In Pro Per

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-8-
9

1
2          RENARD vs. SAN DIEGO UNIFIED PORT DISTRICT FIRST AMENDED COMPLAINT
                        CASE NO. 37-2007-00073093-CU-BC-CTL
3                                PAGE NO. EIGHT
4
5
                        **VERIFICATION**
6
7
STATE OF CALIFORNIA,                    Case No. 37-2007-00073093-CU-BC-CTL
8
                     :§§        RENARD v. SAN DIEGO UNIFIED PORT DIST.
9
COUNTY OF SAN DIEGO:
10
11
       I, DANIEL RENARD,  if called upon to testify as a witness, would and competently do so
12
of my own personal knowledge and do now declare as follows:
13
       I am a party to this action. I have read the foregoing document, entitled First Amended
14
Verified Complaint for 1) Enforcement of Settlement Agreement; 2) Breach of Written Contract; 3)
15
Negligent Misrepresentation; 4) Fraud & Deceit; 5) Breach of Implied Covenant of Good Faith and
16
Fair Dealing, and 6) Declaratory Relief,  and know its contents. The matters stated are true of my
17
own knowledge and belief, and as to those matters I believe them to be true.
18
       I hereby declare under penalty of perjury, under the laws of the state of California, that the
19
foregoing is true and correct.
20
21
22
Date: 11-19-07                          By: _____
23
                                            Daniel Renard
24
25
26
27
28

                              -8-
                              /16

00010

# "EXHIBIT A"



## SETTLEMENT AGREEMENT AND
## RELEASE OF ALL CLAIMS

For the consideration of the issuance of a disabled permit for the San Diego Unified Port District's A-9 Anchorage, issued to the undersigned, plaintiff Daniel Renard (hereafter the "undersigned"), releases and forever discharges SAN DIEGO UNIFIED PORT DISTRICT, its Board of Port Commissioners, officers, agents and employees (all hereinafter singly and collectively referred to as "the parties hereby released"), from any and all matters, claims, liens and suits of every kind whatsoever which the undersigned now has, ever had or hereafter will have against any of the parties hereby released, including (but without limiting the generality of the foregoing) any known or unknown personal injuries, property damage, loss, cost or expenses of every nature whatsoever resulting from the first amended complaint filed by the undersigned in the case of *Daniel Renard v. San Diego Unified Port District, et al.*, United States District Court Case No. 03 CV 1443 J (JFS) on August 26, 2003.

In further consideration, the undersigned agrees as follows:

1)    The undersigned will comply with all requirements of the A-9 Anchorage Permit issued to them, including but not limited to: a) Only public dinghy docks and landings may be used by the undersigned, such as that found at the foot of Laurel Street or the dock northeast of the USCG Air Station; b) The beaching of vessels or parking a vehicle on any leased property surrounding the anchorage is prohibited; c) vessels must anchor within the A-9 anchorage boundaries; and, d) the pump out facility and docks at the Sunroad Marina are part of a private, leased facility and may not be used without the permission of the dock master; and e) any vessel anchored in violation of any provision of these restrictions would be subject to permit suspension or revocation and/or removal and storage of the vessel pursuant to San Diego Unified Port District Code Section 8.25(a).

2)    The undersigned acknowledges that he shall not anchor in any portion of San Diego Bay without a permit as set forth in the San Diego Unified Port District Code.

3)    The undersigned agrees to be law abiding, and to comply with all applicable federal, state and local laws, including provisions of the San Diego Unified Port District Code.

4)    The undersigned shall file with the court a dismissal of the first amended complaint with prejudice, in its entirety.

The undersigned hereby expressly waives all rights under Section 1542 of the California Civil Code, which reads as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which is known by him must have materially affected his settlement with the debtor.

The undersigned hereby understands and represents that reliance is placed wholly upon his own judgment, belief and knowledge as to the nature, extent and duration of said injuries

and damage; that no statement with regard thereto made by or on behalf of any of the parties hereby released has in any way influenced him in making this settlement; that the foregoing consideration is received in settlement and compromise of a disputed claim and is not an admission of any liability whatsoever by any of the parties hereby released; that this release contains the entire agreement between it and the parties hereby released; and, that the terms hereof are contractual and are not mere recitals.

**THE UNDERSIGNED HEREBY DECLARES THAT HE HAS CAREFULLY
READ AND FULLY UNDERSTOOD THIS RELEASE PRIOR TO SIGNING IT.**

DANIEL RENARD

SIGNED this ___2___ day of December, 2003

00013

Page 2 of 2

# "EXHIBIT B"

CALIFORNIA COASTAL COMMISSION
SAN DIEGO AREA
7575 METROPOLITAN DRIVE, SUITE 103
SAN DIEGO. CA   92108-4421
(619) 767-2370



June 21, 2007

William Briggs
San Diego Unified Port District
P.O. Box 120488
San Diego, CA 92112-0488

Re:  Changes to the A-8 Anchorage

Dear Mr. Briggs:

As we have discussed recently, Commission staff have been contacted by members of the
public regarding changes been made at the A-8 Anchorage. As you know, the certified
Port Master Plan (PMP) states regarding Anchorage A-8 "[a]pproximately 250 vessels at
single swing point anchorage using vessel ground tackle can be accommodated; however,
use shall be incremental, the first phase to provide for up to 100 vessels, with any
additional 100 increments to be subject to further public hearings and consultations with
District member cities. About 30 percent of the spaces are to be reserved for short-term
use by transient ocean cruising vessels."

Staff understanding is that in the past, the Port has made the A-8 Anchorage available to
those boaters who want to anchor their vessels at no cost for an unlimited period of time.
However, the Board of Port Commissioners have recently voted to eliminate the A-8
Anchorage as a long-term unlimited anchorage, and have adopted ordinance changes
involving new permit regulations, fees, and a boater buyout program for the 40 vessels
currently at the anchorage. Boaters who do not take the buyout can remain at the
anchorage, if they meet the permit requirements, at least until new moorings (not yet
identified) are available for rent in the future. Presumably, any boaters remaining at that
time would be required to leave. Boaters may still drop anchor in the A-8 Anchorage to
fish, have lunch, watch the sunset, etc., without the need for a permit, but overnight stays
would be prohibited, and no new permits are being or will be issued for the anchorage.

Commission staff is concerned that the A-8 Anchorage is not currently operating as
required by the PMP, and it appears the recent adoption of new ordinance(s) will
continue or increase the inconsistencies. Absent a PMP Amendment, the anchorage
should continue to be made available to approximately 100 vessels, with approximately
33 spaces reserved for short-term cruisers. User fees and permit requirements that
specify duration of stay are within the management and regulatory authority of the Port
District, but requirements should be related to environmental, safety and health issues
that do not unreasonably deter use of the anchorage.

The anchorage does not currently provide space for 100 vessels and permits for short-
term cruisers are not being issued. The operational changes recently undertaken by the
Port are clearly designed to phase out and eventually eliminate anchoring at A-8. These

00015

June 21, 2007
Page 2

past and on-going changes to the A-8 Anchorage are not consistent with the text of the master plan and should be processed as a Port Master Plan Amendment prior to implementation of the changes. Future changes to moorings that are within the scope of a revised PMP might still require issuance of a coastal development permit. For example, physically removing mooring facilities, or reducing the availability of spaces, would be a change in intensity of use that would require a coastal development permit appealable to the Coastal Commission.

Recreational boating and lower-cost visitor and recreational facilities such as short-term anchorages are strongly supported under the Coastal Act. In our phone conversations, you have indicated that the Port plans on converting the anchorage to special event anchoring. An analysis of the impact the elimination of cruiser spaces at A-8 would have on the availability and affordability of short-term boater accommodations in the bay should be submitted with the Port Master Plan Amendment application. In addition, the Port should address the historical use of the anchorage and what alternative remain for long-term users of the facility.

Thank you for you attention to this matter, and please let me know if you have any questions.

Sincerely,

Diana Lilly

Diana Lilly
Coastal Planner

cc:     Deborah Lee
        Sherilyn Sarb
        Michael Patrick Conelly
        Daniel Renard

(G:\San Diego\DIANA\PORT\A-9 Anchorage ltr.doc)

00016

# "EXHIBIT C"

shallow and too narrow to accommodate larger ships). Boat channels will be kept clear of encroaching water or land uses, which would deter waterborne circulation. These channels serve the navigation system in a manner similar to that provided by streets in a land-based circulation system. Boat corridors in 1978 provided for a fleet of more than 4000 pleasure craft permanently moored on the waters of the bay and provided corridors from the public launching ramps that launched thousands of pleasure craft out of almost 33,000 registered boats in San Diego County. New boat navigation corridors will be required to serve new marina developments. Maintenance dredging and improvements to existing channels, as required, are to be conducted.

 **Small Craft Mooring and Anchorage Areas** have been planned to facilitate the retention and orderly management and development of a variety of functional, aesthetically pleasing facilities in carefully selected sites. The intent of the plan is to prohibit long term permanent or semi-permanent indiscriminate anchoring through- out the Bay in a manner so as not to interfere with short term uses of the bay for fishing, sailing, and other social and recreational activity, including the rafting of vessels. Long term anchoring and mooring shall be limited to designated anchorages under local control of the jurisdictional authority of the Port District, U. S. Navy, and the State Department of Parks and Recreation. Long term users are encouraged to use marinas where there are secure moorings and shoreside support facilities which have been provided by private investors. Changes to Federal regulations pertaining to anchorages can be accomplished by complying with the established procedure which permits the new regulations to go into effect after publication in the Federal Register.

The use or development of the proposed anchorages shall be at the discretion of the U.S. Navy (A-6), the State Department of Parks and Recreation (A-7), and the Port District (A-1 to A-5 and A-8). In the Port District's anchorages, the actual operation of

the anchorage shall be conducted by the Port District or under a lease agreement to other governmental agency or to a private operator. Port funds or possibly private development monies are to be expended for the planning, construction and regulation of anchorages and moorings for use by vessels which are solely or primarily used for commerce, navigation, fisheries and recreation. The use of bay water areas for residential use, involving living aboard vessels as a primary place of residence, is discouraged as a matter of policy in accordance with state law.

Improvements and the level of service in anchorages are functional but greatly reduced from those provided in marinas. Anchorages are not a secure as marinas for keeping vessels at mooring station, require more water area per vessel stored, and do not have dockside utilities and access. Shoreside facilities for anchorages range widely, from natural shoreline to dinghy float, and may or may not include: dock and ramp; night lighting; potable water supply; disposal stations for trash, petroleum products and sewage; public telephone; limited automobile parking, and restrooms. The safety and security of vessels at anchor remain the responsibility of the vessel owner or operator who must keep apprised of weather conditions and storm warnings and take the necessary precautions to insure the safety of their vessels, other craft, and harbor improvements. The lower level of service and facilities in anchorages is frequently reflected in lower user fees and sometimes public subsidies.

In the Port District's jurisdiction, the primary basis for the management and regulation of intensively used anchorages will be by the establishment of a lease relationship with user fees and permits which specify duration of stay. Anchorages are to be made available to seaworthy, self-propelled vessels which are subject to periodic inspection that insures proper moorings, adequate fire fighting equipment, approved marine sanitation devices, and registration or documentation of vessel ownership. The management of anchorages is also to be conducted so as to maintain a program of flotsam and debris clean-up, regularly monitored water quality, and controls on overboard discharges.

(041196)

44

"EXHIBIT D"

**Environment**

The Coast Guard considered the environmental impact of this rule and concluded that under paragraph 2.B.2 of Commandant Instruction M16475.1B, it will have no significant environmental impact and it is categorically excluded from further environmental documentation. A Categorical Exclusion Determination and environmental analysis checklist will be available for inspection and copying in the docket to be maintained by the local Coast Guard Marine Safety Office.

**List of Subjects in 33 CFR Part 100**

Regattas and Marine parades.

**Regulation**

For the reasons set out in the preamble, the Coast Guard amends 33 CFR part 100, as follows:

**PART 100 [AMENDED]**

1. The authority citation for part 100 continues to read as follows:

**Authority:** 33 U.S.C. 1233 through 1236; 49 CFR 1.46; 33 CFR 100.35.

2. In § 100.1101, paragraph (a) is revised, and Table 1 is amended by adding an entry for the U.S. National Waterski Racing Championship immediately following the last entry, to read as follows:

**§ 100.1101   Southern California annual marine events.**

(a) Special local regulations will be established for the events listed in Table 1. Further information on exact dates, times, details concerning the number and type of participants and an exact geographical description of the areas are published by the Eleventh Coast Guard District in the Local Notice to Mariners at least 20 days prior to each event. To be placed on the mailing list contact: Commander (Pow), Eleventh Coast Guard District, Coast Guard Island, Building 50–6, Alameda, CA 94501–5100.

\*    \*    \*    \*    \*

**Table 1**

US National Waterski Racing Championship

Sponsor: U.S. National Waterski Racing Association

Date: First Friday of October every year, lasting a total of 3 days (including the first Friday of October).

Location: Mission Bay, San Diego, California, from Government Island south to Ski Beach.
Dated: March 20, 1998.

**J. C. Card,**
*Vice Admiral, U.S. Coast Guard, Commander, Eleventh Coast Guard District.*
[FR Doc. 98–8958 Filed 4–3–98; 8:45 am]
**BILLING CODE 4910–15–M**

---

**DEPARTMENT OF TRANSPORTATION**

**Coast Guard**

**33 CFR Part 100**

[CGD11–98–002]

**RIN 2115–AE46**

**Special Local Regulations; Parker Enduro**

**AGENCY:** Coast Guard, DOT.
**ACTION:** Implementation of rule.

**SUMMARY:** This document implements 33 CFR 100.1102, "Marine Events on the Colorado River, between Davis Dam (Bullhead City, Arizona) and Headgate Dam (Parker, Arizona)," for the Parker Enduro hydroplane racing boat event. This event consists of hydroplane racing using high-speed powerboats with a length of 16 to 23 feet. These regulations will be effective on that portion of Lake Moovalya, Parker, Arizona, between miles 179 and 185 of the Colorado River (between the Roadrunner Resort and Headgate Dam). Implementation of 33 CFR 100.1102 is necessary to control vessel traffic in the regulated areas during the event to ensure the safety of participants and spectators.

Pursuant to 33 CFR 100.1102(c)(3), Commander, Coast Guard Activities San Diego, is designated Patrol Commander for this event; he has the authority to delegate this responsibility to any commissioned, warrant, or petty officer of the Coast Guard.

**DATES:** This section is effective from 8 a.m. PDT, until 6 p.m. PDT, on May 2, 1998, and from 8 a.m. PDT, until 6 p.m. PDT, on May 3, 1998.

**FOR FURTHER INFORMATION CONTACT:**
OMC Michael C. Claeys, U.S. Coast Guard Activities San Diego, California; Tel: (619) 683–6309.

**Discussion of Implementation**

The Packer Enduro, sponsored by the Parker Area Chamber of Commerce, is

scheduled to occur on May 2–3, 1998. This annual event, usually scheduled to occur in early March, is expected to again be held in March in subsequent years. These Special Local Regulations permit Coast Guard control of vessel traffic in order to ensure the safety of spectator and participant vessels. In accordance with the regulations in 33 CFR 100.1102, no persons or vessels shall block, anchor, or loiter in the regulated area; nor shall any person or vessel transit through the regulated area, or otherwise impede the transit of participant or official patrol vessels in the regulated area, unless cleared for such entry by or through an official patrol vessel acting on behalf of the Patrol Commander.

• Dated: March 20, 1998.
**J.C. Card,**
*Vice Admiral, U.S. Coast Guard, Commander, Eleventh Coast Guard District.*
[FR Doc. 98–8957 Filed 4–3–98; 8:45 am]
**BILLING CODE 4910–15–M**

---

**DEPARTMENT OF TRANSPORTATION**

**Coast Guard**

**33 CFR Part 110**

[CGD11–97–007]

**RIN 2115–AA98**

**Anchorage Regulations: San Diego Harbor, CA**

**AGENCY:** Coast Guard, DOT.
**ACTION:** Final rule.

**SUMMARY:** The Coast Guard hereby establishes several special anchorages in San Diego Bay, California. A "special anchorage" is an area on the water where vessels less than 20 meters (approximately 65 feet) in length are allowed to anchor without displaying navigation lights which are otherwise required for anchored vessels under Rule 30 of the Inland Navigational Rules, codified at 33 U.S.C. 2030. The intended effect of these special anchorages is to reduce the risk of vessel collisions within San Diego Bay by specifying more special anchorage areas which will provide designated sites for vessels less than 20 meters in length.

**DATES:** This rule becomes effective May 6, 1998.

**FOR FURTHER INFORMATION CONTACT:**
Lieutenant Mike Arguelles, Marine Safety Office, San Diego, (619) 683–6484, or Mike Van Houten, USCG, Pacific Aids to Navigation and Waterways Management Branch, Eleventh Coast Guard District, (510) 437–2984.

**SUPPLEMENTARY INFORMATION:**

**Regulatory History**

On November 25, 1997, the Coast Guard published a notice of proposed rulemaking (NPRM) for this regulation in the Federal Register [62 FR 62734]. The comment period ended January 26, 1998. The Coast Guard received no comments. A public hearing was not requested and no hearing was held.

**Background and Purpose**

A special anchorage is an area on the water in which vessels less than 20 meters (approximately 65 feet) in length are allowed to anchor without displaying navigation lights. Such lights are otherwise required for anchored vessels under Rule 30 of the Inland Navigational Rules, codified at 33 U.S.C. 2030. This rule establishes 7 new special anchorage areas, and modifies 4 special anchorage areas already in existence, in San Diego Harbor, San Diego, California.

**Discussion of Regulation**

The Coast Guard establishes 7 new special anchorage areas (A–1a, A–1b, A–1c, A–4, A–6, A–8, & A–9), and modifies the 4 special anchorge areas already in existence (A–1, A–2, A–3, & A–5), in San Diego Harbor, San Diego, California, as follows:

(A–1, A–1a, A–1b, A–1c) Shelter Island Moorings, North San Diego Bay, approximately 75 yards off shore and along Shelter Island (for A–1, minor corrections to some of the coordinates describing the corner points of the special anchorage area),

(A–2 America's Cup Harbor, North San Diego Bay, in the area known as Commercial Basin (minor corrections to some of the coordinates describing the corner points of the special anchorage area),

(A–3) Laurel Street Roadstead Moorings, North San Diego Bay, east of the Coast Guard Activities installation (minor corrections to some of the coordinates describing the corner points of the special anchorage area),

(A–4) Bay Bridge Roadstead Moorings, Central San Diego Bay, at the northwest end of the Coronado Bridge,

(A–5) Glorietta Bay Anchorage, Central San Diego Bay, across the bay from Naval Amphibious Base (minor corrections to some of the coordinates

describing the corner points of the special anchorage area),

(A–6) Fiddlers Cove, South San Diego Bay, just south of the Naval Amphibious Base,

(A–8) Sweetwater Anchorage, South San Diego Bay, west of 24th Street, Marine Terminal, and

(A–9) Cruiser Anchorage, North San Diego Bay, west of the Coast Guard Activities installation.

The primary users of these anchorages are recreational vessels, with the majority of them being long term users. Some of the anchorages are depicted on local charts, while all of them use buoys to delineate their boundaries. By establishing these areas as special anchorages, the requirement of displaying anchor lights and day shapes will be removed for vessels less than 20 meters in length.

**Discussion of Comments**

No comments were received.

**Regulatory Evaluation**

This rule is not a significant regulatory action under section 3(f) of Executive Order 12866 and does not require an assessment of potential costs and benefits under section 6(a)(3) of that order. It has been exempted from review by the Office of Management and Budget under that order.

It is not significant under the regulatory policies and procedures of the Department of Transportation (DOT) (44 FR 11040, February 26, 1979). The Coast Guard expects the economic impact of this rule to be so minimal that a full Regulatory Evaluation under paragraph 10(e) of the regulatory policies and procedures of DOT is unnecessary. This rule will impose no cost on vessel operators, it will have minimal impact on vessel traffic, and will provide more options to vessels desiring to anchor in San Diego Bay.

**Small Entities**

Under 5 U.S.C. 601 et seq., known as the Regulatory Flexibility Act, the Coast Guard must consider whether this rule will have a significant economic impact on a substantial number of small entities. Small Entities include independently owned and operated small businesses that are not dominant in their field and that otherwise qualify as "small business concerns" under section 3 of the Small Business Act (15 U.S.C. 632). Since the impact of this rule is expected to be minimal, the Coast Guard certifies that 5 U.S.C. 605(b), that this rule will not have a significant economic impact on a substantial number of small entities.

**Collection of Information**

This rule imposes no collection of information requirements under the Paperwork Reduction Act.

**Federalism**

This rule has been analyzed in accordance with the principles and criteria contained in Executive Order 12612, and it has been determined that the rule making does not have sufficient federalism implications to warrant the preparation of a Federalism Assessment.

**Environment**

This rule has been reviewed by the Coast Guard and determined to be categorically excluded from further environmental documentation in accordance with section 2.B.2 of Commandant Instruction M16475.1B. A Categorical Exclusion Determination and Environmental Analysis Checklist will be available for inspection and copying in the docket to be maintained at the local Coast Guard Marine Safety Office.

**List of Subjects in 33 CFR Part 110**

Anchorage grounds.

**Regulation**

In consideration of the foregoing, the Coast Guard amends part 110 of Title 33, Code of Federal Regulations as follows:

**PART 110—[AMENDED]**

1. The authority citation for part 110 continues to read as follows:

**Authority:** 33 U.S.C. 471, 1221 through 1236, 2030, 2035, 2071; 49 CFR 1.46 and 33 CFR 1.05–1(g).

1. Section 110.90 is revised to read as follows:

**§ 110.90  San Diego Harbor, California.**

(a) Area A–1. In North San Diego Bay, the Shelter Island Yacht Basin Anchorage, the water area enclosed by a line beginning at latitude 32°42'56.7" N., longitude 117°13'47.1" W.; thence southwesterly to latitude 32°42'53.6" N., longitude 117°13'51.3" W.; thence northwesterly to latitude 32°43'01.3" N., longitude 117°13'59.1" W.; thence northeasterly to latitude 32°43'02.6" N., longitude 117°13'55.5" W.; thence southeasterly to latitude 32°42'59.8" N., longitude 117°13'50.4" W.; thence southeasterly to the point of beginning.

(b) Area A–1a. In North San Diego Bay, the Shelter Island Roadstead Anchorage east of Shelter Island, the water area 55 feet either side of a line beginning at latitude 32°42'33.6" N., longitude 117°13'48.3" W.; thence

northeasterly to latitude 32°42'36.0" N., longitude 117°13'45.1" W.

(c) *Area A–1b.* The water area off Shelter Island's eastern shore, 210 feet shoreward of a line beginning at latitude 32°42'43.9" N., longitude 117°13'34.3" W.; thence northeasterly to latitude 32°42'52.8" N., longitude 117°13'22.4" W.

(d) *Area A–1c.* The water area off Shelter Island's eastern shore, 210 feet shoreward of a line beginning at latitude 32°42'55.0" N., longitude 117°13'19.4" W.; thence northeasterly to latitude 32°43'03.5" N., longitude 117°13'07.6" W.

(e) *Area A–2.* In North San Diego Bay, the America's Cup Harbor Anchorage, the water area enclosed by a line beginning at latitude 32°43'13.7" N, longitude 117°13'23.8" W; thence northeasterly to latitude 32°43'16.7" N., longitude 117°13'16.4" W.; thence northwesterly to latitude 32°43'22.6" N., longitude 117°13'25.8" W.; thence westerly to latitude 32°43'22.5" N., longitude 117°13'29.6" W.; thence southwesterly to latitude 32°43'19.0" N., longitude 117°13'32.6" W.; thence southeasterly to the point of beginning.

(f) *Area A–3.* In North San Diego Bay, the Laurel Street Roadstead Anchorage, the water area enclosed by a line beginning at latitude 32°43'30.5" N., longitude 117°10'28.5" W.; thence southwesterly to latitude 32°43'29.8" N., longitude 117°10'34.2" W.; thence southwesterly to latitude 32°43'25.8" N., longitude 117°10'36.1" W.; thence southerly to latitude 32°43'20.2" N., longitude 117°10'36.1" W.; thence westerly to latitude 32°43'20.2" N., longitude 117°10'52.9" W.; thence northeasterly to 32°43'29.8" N., longitude 117°10'48.0" W., thence northeasterly following a line parallel to, and 200 feet bayward of, the shoreline of San Diego Bay adjoining Harbor Drive to the point of beginning.

(g) *Area A–4.* In Central San Diego Bay, the Bay Bridge Roadstead Anchorage, the water area enclosed by a line beginning at latitude 32°41'32.1" N., longitude 117°09'43.1" W.; thence southwesterly to latitude 32°41'19.1" N., longitude 117°09'46.1" W.; thence southeasterly to latitude 32°41'17.8" N., longitude 117°09'44.3" W.; thence southeasterly to latitude 32°41'14.9" N., longitude 117°09'37.9" W.; thence northeasterly to latitude 32°41'26.9" N., longitude 117°09'35.1" W., thence southwesterly to the point of beginning.

(h) *Area A–5.* In Central San Diego Bay, the Glorietta Bay Anchorage, the water area enclosed by a line beginning at latitude 32°40'42.2" N., longitude 117°10'03.1" W.; thence southwesterly to latitude 32°40'41.2" N., longitude

117°10'06.6" W.; thence northwesterly to latitude 32°40'46.2" N., longitude 117°10'15.6" W.; thence northeasterly to latitude 32°40'46.7" N., longitude 117°10'14.1" W.; thence southeasterly to the point of beginning.

(i) *Area A–6.* In Fiddler's Cove, the water enclosed by a line beginning at latitude 32°39'10.4" N., longitude 117°08'49.4" W.; thence northwesterly to latitude 32°39'14.9" N., longitude 117°08'51.8" W.; thence northeasterly to latitude 32°39'17.6" N., longitude 117°08'47.5" W.; thence northwesterly to latitude 32°39'19.8" N., longitude 117°08'48.8" W.; thence northeasterly to latitude 32°39'24.4" N., longitude 117°08'41.4" W.; thence southeasterly to latitude 32°39'15.7"N., longitude 117°08'36.0" W.; thence southwesterly to the point of beginning.

**Note:** This area is located on Federal property owned by the United States Navy, and it is reserved for active duty military, their dependents, retirees, and DOD employees only.

(j) *Area A–8.* In South San Diego Bay, the Sweetwater Anchorage, the water enclosed by a line beginning at latitude 32°39'12.2" N., longitude 117°07'45.1" W.; thence easterly to latitude 32°39'12.2" N., longitude 117°07'30.1" W.; thence southerly to latitude 32°38'45.2" N., longitude 117°07'30.1" W.; thence westerly to latitude 32°38'45.2" N., longitude 117°07'45.1" W.; thence northerly to the point of beginning.

(k) *Area A–9.* In North San Diego Bay, the Cruiser Anchorage, the water enclosed by a line beginning at latitude 32°43'35.9" N., longitude 117°11'06.2" W.; thence southwesterly to latitude 32°43'31.5" N., longitude 117°11'13.2" W.; thence southeasterly to latitude 32°43'28.9" N., longitude 117°11'11.0" W.; thence southeasterly to latitude 32°43'25.9" N., longitude 117°11'07.7" W.; thence northeasterly to latitude 32°43'34.8" N., longitude 117°11'03.2" W., thence northwesterly to the point of beginning. All coordinates in this section use Datum: NAD 83.

**Note:** Mariners anchoring in these anchorages, excluding Anchorage A–6, should consult applicable local ordinances of the San Diego Unified Port District. Temporary floats or buoys for marking anchors are allowed. Fixed moorings, piles or stakes are prohibited. All moorings shall be positioned so that no vessel, when anchored, shall at any time extend beyond the limits of the area. See Captain of the Port Notice 6–97, a copy of which can be obtained by calling (619) 683–6495.

Dated: March 20, 1998.

J.C. Card,

*Vice Admiral, U.S. Coast Guard Commander, Eleventh Coast Guard District.*

[FR Doc. 98–8959 Filed 4–3–98; 8:45 am]

**BILLING CODE 4910–15–M**

---

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Part 180**

**[OPP–300639; FRL–5784–4]**

**RIN 2070–AB78**

## Rimsulfuron (N-((4,6-dimethoxypyrimidin-2-yl)aminocarbonyl)-3-(ethylsulfonyl)-2-pyridinesulfonamide); Pesticide Tolerance

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** This regulation establishes a time limited tolerance for residues of rimsulfuroron in or on tomatoes. E.I.duPont de Nemours and Company, Inc. requested this tolerance under the Federal Food, Drug and Cosmetic Act (FFDCA), as amended by the Food Quality Protection Act of 1996 (Pub. L. 104–70).

**DATES:** This regulation is effective April 6, 1998. Objections and requests for hearings must be received by EPA on or before June 5, 1998.

**ADDRESSES:** Written objections and hearing requests, identified by the docket control number, [OPP–300639], must be submitted to: Hearing Clerk (1900), Environmental Protection Agency, Rm. M3708, 401 M St., SW., Washington, DC 20460. Fees accompanying objections and hearing requests shall be labeled "Tolerance Petition Fees" and forwarded to: EPA Headquarters Accounting Operations Branch, OPP (Tolerance Fees), P.O. Box 360277M, Pittsburgh, PA 15251. A copy of any objections and hearing requests filed with the Hearing Clerk identified by the docket control number, [OPP–300639], must also be submitted to: Public Information and Records Integrity Branch, Information Resources and Services Division (7502C), Office of Pesticide Programs, Environmental Protection Agency, 401 M St., SW., Washington, DC 20460. In person, bring a copy of objections and hearing requests to Rm. 119, CM #2, 1921 Jefferson Davis Hwy., Arlington, VA.

A copy of objections and hearing requests filed with the Hearing Clerk may also be submitted electronically by

***Renard v. San Diego Unified Port District, et al.***
**Case No. 7 2347 H (BLM)**

## CERTIFICATE OF SERVICE

The following document(s) are associated with this transaction:

**DEFENDANT SAN DIEGO UNIFIED PORT DISTRICT'S OPPOSITION TO PLAINTIFF'S MOTION FOR REMAND**

**Notice will be electronically mailed to:**

N/A

**Notice will be delivered by other means to:**

Daniel Renard
P.O. Box 6301
San Diego, CA 92166


I declare under penalty of perjury that the foregoing is true and correct. Executed this 29TH day of January, 2008, at San Diego, California.


By:  s/Ellen Gross Miles
     E-mail:  egross@portofsandiego.org